Mary Anne O'BRANNON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2704.

Court of Appeals of Alaska.

May 24, 1991.

Helen L. Simpson, Simpson & Thompson, P.C., Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS, J., and ANDREWS, Superior Court Judge.*

OPINION

COATS, Judge.

On April 25, 1988, Mary Anne O'Brannon was convicted of eighteen counts of criminal contempt. AS 09.50.010(5) and 09.50.-020. The criminal contempt charges were based on allegations that O'Brannon had violated the conditions of a Stipulated Order and Finding of Contempt signed on October 1, 1985. O'Brannon appeals from these convictions, arguing that several errors were made at trial, and that her sentence was excessive.

O'Brannon was in the business of producing telephone directories. In the fall of 1982, her business, the Alaska Directory Service, Inc., published a telephone directory of business listings. After publication of this directory, various Anchorage utilities sued O'Brannon in Federal District Court for copyright infringement. A stipulated order was signed in 1982 which prohibited her from producing or distributing any directories.

Despite the federal court order, the Consumer Protection Division of the Alaska Attorney General's Office ["the Division"] received complaints that O'Brannon had collected advance payments for advertising in the 1983, 1984, and 1985 directories; these directories were never published. On August 29, 1984, O'Brannon entered an "Assurance of Voluntary Compliance" in which she agreed to make restitution to subscribers. When O'Brannon failed to comply with this assurance, the Attorney General's Office filed a Complaint for Injunctive Relief and Civil Penalties, alleging violations of AS 45.50.471. Assistant At-

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

torney General Robert E. Mintz signed this complaint.

On May 7, 1985, Superior Court Judge Milton M. Souter entered a Consent Judgment and Injunction. This judgment enjoined O'Brannon from soliciting or accepting any advance payments or deposits for directory advertising, unless the payments or deposits were immediately placed in a trust or escrow account and various other conditions were met. The injunction also required O'Brannon to refund deposits or advance payments made for advertising in directories which were never published; this restitution was to be administered by the Consumer Protection Division of the Attorney General's Office.

On September 6, 1985, the Division filed a Supplemental Complaint for Civil Contempt. The state alleged that O'Brannon had violated the Consent Judgment and Injunction by soliciting and obtaining advance payments and deposits for future directory advertising, and failing to place these payments and deposits in a trust or escrow account. Assistant Attorney General Mintz signed this complaint.

Judge Souter entered a stipulated order and finding of contempt on October 1, 1985. This order permanently enjoined O'Brannon from: soliciting or accepting any advance payment or deposit in connection with any type of advertising or publication; participating or associating with any business or other activity which involves the solicitation or acceptance of advance payments or deposits for advertising or for any publication. The order also prohibited O'Brannon, for a period of five years, from soliciting or accepting any advance payment or deposit in connection with any product or service. The order required O'Brannon, for a period of five years, to notify the Division in writing within ten days of each change in any of her employment or business relationships or activities. She was also required to report to the Division at the end of each calendar year, for a five-year period, on her employment and business relationships and activities. O'Brannon was also ordered to immediately terminate all participation in or association with any directory business which was soliciting or accepting advance payments or deposits.

On February 20, 1986, Judge Souter ordered O'Brannon to pay restitution in the amount of $20,000 to reimburse directory advertising customers for advance payments made after May 7, 1985, to reimburse the State of Alaska for attorney and investigative fees of $16,536.50 and costs of $7,424, and to pay the State of Alaska civil penalties in the amount of $50,000.

The Division conducted an investigation of O'Brannon in which they allegedly discovered that O'Brannon was still running a directory business which solicited and accepted advance payments or deposits; O'Brannon called these payments and deposits "set-up fees." The Division obtained a search warrant and conducted a search of O'Brannon's business. They seized written business records and computer diskettes containing business records.

Based on evidence obtained through the Division's investigation of O'Brannon and search of her business, the Anchorage District Attorney's Office charged O'Brannon with eighteen counts of criminal contempt. Each count charged O'Brannon with violating AS 09.50.010(5) and 09.50.020, and stated that her contempt "defeated or prejudiced the state's remedy." Counts I through X charged O'Brannon with soliciting or accepting advance payments or deposits for phone directory advertising from ten different businesses. Count XI charged O'Brannon with participating in a business that solicited or accepted advance payments or deposits for phone directory advertising. Counts XII–XV charged O'Brannon with soliciting or accepting advance payments for travel guide advertising from four different businesses. Count XVI charged O'Brannon with participating or associating with a business which solicited or accepted advance payments or deposits for advertising in a travel guide. Count XVII charged O'Brannon with failing to provide the Division with documentation detailing the customers to whom she had made restitution for failing to publish past directories, and the amounts which

she had paid to each customer. Count XVIII charged O'Brannon with failing to file yearly reports, at the end of each calendar year, on her employment and business relationships and activities. In April of 1988, O'Brannon was convicted by a jury of the eighteen counts of criminal contempt.

■ O'Brannon first argues that Trial Judge Mark C. Rowland erred in allowing Assistant Attorney General Mintz to sit at counsel table with the District Attorney who was prosecuting the case. Mintz was the attorney in the Division who had initiated the civil suit against O'Brannon. Mintz had signed the complaint for injunctive relief and civil penalties of January 27, 1985; the stipulation for entry of consent judgment and injunction of April 30, 1985; and the supplemental complaint for civil contempt of September 6, 1985. Mintz had also brought the case to the District Attorney's Office and asked that it be prosecuted. Mintz had drafted the pleadings.

Judge Rowland denied the defense motion to preclude Mintz as a witness. Defense counsel then asked Judge Rowland to preclude Mintz from sitting at counsel table, preparing exhibits, preparing documents, drafting pleadings, or otherwise acting as an attorney in the case. Judge Rowland ruled that Mintz could testify in the case and could remain in the courtroom. However, he ruled that Mintz could not "argue, advocate, question or perform any of the other functions that trial counsel generally perform." Judge Rowland then instructed the jury that Mintz's role was only as a witness and that Mintz was not participating as counsel in the trial.

■ A trial court's decision on a motion to disqualify opposing counsel because he may be testifying as a witness will be reviewed for an abuse of discretion. *Munn v. Bristol Bay Housing Authority,* 777 P.2d 188, 196 (Alaska 1989). A trial court's decision whether to exclude a witness under Evidence Rule 615 is also reviewed under the abuse of discretion stan-

dard. *Schroff v. State,* 627 P.2d 653, 655–56 (Alaska App.1981).

O'Brannon contends that under Disciplinary Rule 5–102(A), Mintz should not have been allowed to remain at counsel table.

Disciplinary Rule 5–102(A) states:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

The exceptions listed under DR 5–101(B)(1) through (4) are inapplicable to this case. Ethical consideration 5–9 suggests that one of the policies underlying the rule is that it is difficult for opposing counsel to attack the credibility of an advocate who testifies as a witness:

Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate.... [T]he opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively. EC 5–9.

In *People v. Superior Court, County of San Bernardino,* 86 Cal.App.3d 180, 150 Cal.Rptr. 156 (1978), the Court analyzed the policies behind Rule 2–111(A)(4) of the Rules of Professional Conduct [1] in regard to whether a district attorney could testify as a witness for the prosecution if the district attorney's office was prosecuting the case. The California Court of Appeal

---

**1.** Rule 2–111(A)(4) is the functional equivalent of DR 5–102(A). It is quoted in full at *County of*

*San Bernardino,* 150 Cal.Rptr. at 160–61.

held that the trial court erred in recusing the entire prosecutorial office of the district attorney because one district attorney might be called as a witness. The court noted that the rule precluding a lawyer from performing the roles of both a witness and an advocate "is fully applicable to deputy district attorneys and proscribes a single deputy's acting as both trial prosecutor and material trial witness on behalf of the prosecution." *Id.*, 150 Cal.Rptr. at 172. The court noted that in criminal proceedings, the problem with having a prosecutor-witness is that the prosecutor's testimony might be accorded too much weight. *Id.* at 173. Because in that case, the prosecutor-witness would not be the prosecutor at trial, there would be no problem with enhanced credibility. *Id.* The court found that there would be no impropriety in the prosecutor testifying, as long as he did not hold himself out to be the prosecutor at trial. *Id.* at 174. Finally, the court noted that there could be no impropriety in having the prosecutor arguing the credibility of a prosecutor-witness to the jury, because there was no functional difference between that and the district attorney arguing the credibility of an investigator. *Id.* Under DR 5–102(A), EC 5–9, and *County of San Bernardino*, it is clear that a prosecutor actually conducting a trial normally cannot also be a witness for the prosecution.

We believe that the trial court could properly find that Mintz's actions during the trial were consistent with those of being an investigator and that the problems of credibility and impropriety which are the basis for DR 5–102(A) did not arise. *See Dickens v. State*, 398 P.2d 1008 (Alaska 1965) (allowing police investigating officer to remain in the courtroom and be seated at counsel table under the predecessor to A.R.E. 615). We place particular emphasis on the fact that the prosecuting attorney was clearly conducting the case, Mintz's role was strictly limited, and that Judge Rowland emphasized to the jury that Mintz was only a witness in the case and was not acting as counsel.

■ O'Brannon also appears to contend that Mintz's participation in the case biased the prosecution of the case against her. In *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 809, 107 S.Ct. 2124, 2138–39, 95 L.Ed.2d 740 (1987), the Supreme Court held that counsel for a private party that is a beneficiary of a court order could not be appointed to prosecute a criminal contempt action alleging violation of that order. The Court noted that, because the private party's interest was in obtaining the benefits of the court order, rather than dispassionately assessing the propriety of the criminal charges, the private party had a conflict of interest. *Id.* at 805, 107 S.Ct. at 2136. The court stated that the private party could assist a disinterested prosecutor in pursuing the contempt action, but that the assistance could not be extended to the point where counsel for the private party is "in control of the prosecution." *Id.* at 806 n. 17, 107 S.Ct. at 2137 n. 17. *See also Person v. Miller*, 854 F.2d 656 (4th Cir.1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989). However, under the facts of this case, the trial court could properly find that the prosecutor from the district attorney's office was in control of the litigation and acted as a disinterested prosecutor. It also does not appear that Mintz had any private interest in the outcome of this case. It therefore seems clear that, since the prosecutor from the district attorney's office was in charge of the case, it was not improper for the court to allow Mintz to provide legal assistance outside of the courtroom, and to act as an investigating officer inside of the courtroom. Since the court apparently made sure that the prosecutor from the district attorney's office was in control of the litigation and that the jury was aware that Mintz's role was not as a prosecutor, but as a witness, we conclude that the court did not abuse its discretion in allowing Mintz to participate.

■ O'Brannon next argues that Judge Rowland erred in instructing the jury on the definition of "advance payment or deposit." The court instructed the jury as follows:

An "advance payment or deposit" includes not only the payment of money

but also the provision or exchange of goods or services. Money, goods, or services advanced by a customer constitute an "advance payment or deposit" even if structured or designated as a "loan."

By itself, mere denomination of a payment or deposit, which would otherwise fall within the terms of this definition, as something else, will not exclude such payment or deposit from its terms. It is for the jury to determine after considering all the relevant facts and circumstances whether an exchange, provision or payment constitutes an "advance payment or deposit."

At trial, O'Brannon objected to the second paragraph of this instruction because it deviated from the definition of "advance payment or deposit" in Judge Souter's 1985 order. The definition of "advance payment or deposit" in Judge Souter's order consisted only of the first paragraph of the instruction given to the jury. The trial court did not change the jury instruction; the trial court noted that this was a question of form and substance, and that substance should control. On appeal, O'Brannon argues that "th[is] instruction came close to directing a verdict."

We conclude that the trial court did not abuse its discretion in giving the second paragraph of the jury instruction. This paragraph does not misstate the law, nor does it direct a verdict. It merely acknowledges that calling "an advance payment" something else does not change the fact that it is an advance payment. It appears to be a common sense, logical instruction, in which the trial court directs the jury not to elevate form over substance. We conclude that the trial court did not abuse its discretion in giving this jury instruction.

█ O'Brannon next argues that Judge Rowland erred in instructing the jury on the term, "willful." At trial, the court gave the following instruction on the definition of the term willful:

Conduct is "willful" when it is done voluntarily and intentionally. A person acts "willfully" with respect to conduct described in a court order when he or she is aware of the court order and voluntarily and intentionally engages in conduct prohibited by the court order or voluntarily and intentionally refrains from conduct required by the court order. *It is not necessary that the proof also show that the person intended to violate the court order.* (Emphasis added.)

At trial, O'Brannon objected to the last sentence of this instruction on the grounds that it would be confusing to the jury. The state argued that under *Rollins v. State,* 748 P.2d 767, 771 n. 1 (Alaska App.1988), a person need not specifically intend to violate a court order for their act to be "willful"; all that is necessary is that the defendant willfully engage in conduct which she knows is violative of the court order. We conclude that, although the state's argument was legally correct, O'Brannon's contention that this last sentence was confusing is valid.

█ For an act of contempt to be willful, the defendant must have been aware of the requirements of the court order, and the defendant must knowingly violate the court's order. In *State v. Browder,* 486 P.2d 925, 943 (Alaska 1971), the court stated that an act of contempt is willful "if done voluntarily and intentionally, that is, with the intent to disobey or disregard the law." *See also Gwynn v. Gwynn,* 530 P.2d 1311, 1313 (Alaska 1975). This definition seems to suggest that "willfully" might require proof of a specific intent to violate a court order. However, case law clarifies that the intent required is an intentional act which the defendant knows violates the court order, not an act motivated by the intent to violate a court order.

█ In *Continental Ins. Cos. v. Bayless & Roberts,* 548 P.2d 398, 407 (Alaska 1976) (footnotes omitted), the court stated

An intentional or willful failure to comply with an order occurs when such failure is not due to inability, but to purposefulness, bad faith or fault of petitioner as distinguished from accidental, inadvertent or negligent conduct. If it is proved that a party had notice of the court's order and was aware of the requirements but failed to comply with the order, in the absence of explanation of the reason

for such failure, a court could infer it to be intentional.

The court in *Continental Insurance* indicated that the intent which is required to prove willfulness is an intent to do the action which violates the court order; the defendant need not act with the specific intent to violate the court order. In essence, the defendant must engage in conduct with the awareness that it violates the court's order, but need not be motivated by the intent to violate the court order. *See Rollins*, 748 P.2d at 771 n. 1 ("[w]illfulness is established by proof of conscious action and does not require a showing of specific intent"). Therefore, the state was correct in arguing that "willful" required an awareness of the requirements of the court order, and an intent to do an action which violates that order. The state was not required to prove O'Brannon had a specific intent to violate the court order.

The last sentence of the challenged instruction informed the jury: "[i]t is not necessary that the proof also show that the person intended to violate the court order." This instruction is technically correct assuming its reference to intent is understood to mean specific intent. It would have been improper to instruct the jury that the state had to prove that O'Brannon specifically intended to violate the court order—in other words, that O'Brannon acted for the express purpose of violating the court's order.

On the other hand, it would have been equally improper to instruct the jury that O'Brannon was not required to be aware that her conduct violated the court's order. In this respect, the challenged instruction is potentially confusing because its use of the word "intended" might have been understood as a reference to general rather than specific intent. So construed, the instruction reasonably could have been taken to mean that O'Brannon did not need to know her conduct violated the court's order—that she could be convicted as long as she knew what the court's order said and knowingly performed acts that violated it, even if she reasonably and in good faith believed that her acts did not amount to a violation. Such an interpretation would

have been erroneous in negating an essential element of the crime of contempt: the awareness that one's conduct violates an order of the court.

In order to determine whether the jury might have been misled by this instruction, we have reviewed the other instructions and the arguments of counsel. In reviewing the other jury instructions, we find that they correctly describe the element of "willful." The other instructions do not seem to compound the error or confusion caused by the jury instruction in question. However, they also do not clarify that instruction.

■ However, we believe that the arguments of counsel adequately clarify the instruction. In closing argument, the prosecutor first listed the elements of criminal contempt, and then argued how each element had been proven. The prosecutor stated that "willfully" means that "she just didn't do it—she didn't accidentally violate the order, she did it willfully, deliberate, on purpose." He later stated that O'Brannon knew what the order said, and she "had to know what she was doing." Later in his argument, the prosecutor reiterated that to prove O'Brannon acted "willfully," he must "establish that she knew the order, what it really meant, and yet she deliberately went ahead with the business." Thus, in his argument, the prosecutor emphasized that O'Brannon had to know that her actions violated the court order.

In her argument, O'Brannon emphasized that her actions had to be willful. However, she did not clarify the term. We can logically assume that, had O'Brannon been concerned that the jury did not adequately understand the concept of "willful," she could have clarified this concept for the jury in light of the prosecutor's opening argument. It appears that she must have concluded that it was unnecessary to do so. Therefore, we find that although the jury instruction on willfulness was potentially misleading, the jury instruction was rendered harmless by the arguments of counsel.

O'Brannon next argues that the prosecution failed to prove that a "right or remedy of a party to an action or proceeding was defeated or prejudiced by the contempt." O'Brannon was charged and convicted of violating AS 09.50.010(5) and 09.50.020. Alaska Statute 09.50.010(5) states:

**Acts or omissions constituting contempt.** The following acts or omissions in respect to a court of justice or court proceedings are contempts of the authority of the court:

. . . .

(5) disobedience of a lawful judgment, order or process of the court ...

Alaska Statute 09.50.020 states:

**Penalty.** A person who is guilty of contempt is punishable by fine of not more than $300 or by imprisonment for not more than six months. However, when the contempt is one mentioned in AS 09.50.010(3)–(12), or in an action before a magistrate, the person is punishable by a fine of not more than $100 unless it appears that a *right or remedy of a party to an action or proceeding was defeated or prejudiced by the contempt,* in which case the penalty shall be as prescribed for contempts described in AS 09.50.010(1) and (2). (Emphasis added.)

The first sixteen charges of contempt alleged that O'Brannon's contempt defeated or prejudiced the state's injunctive remedy, count seventeen alleged that O'Brannon's contempt defeated or prejudiced the state's remedy of restitution, and count eighteen alleged that O'Brannon's contempt defeated or prejudiced the state's remedy requiring her to inform the state of her business activities and locations.

At trial, the jury was instructed, without objection, that in order to find O'Brannon guilty, they must find that each charged act of contempt defeated or prejudiced a right or remedy of the state.

During deliberations, the jury sent a note requesting clarification of the phrase "defeated or prejudiced the state's injunctive remedy." The court responded with a supplemental instruction which defined "injunctive remedy," and said that the rest of

the words should be given "their ordinary and commonly understood meaning."

On appeal, O'Brannon argues that the state failed to prove the element of prejudice to a right or remedy of a party. She contends that prejudice to the state's injunctive remedy is insufficient proof to subject her to a fine of greater than $100. The state asserts that it presented sufficient evidence that its injunctive remedy was prejudiced. The state also argues that the issue of whether a right or remedy of a party was defeated or prejudiced is an issue for the judge at sentencing.

 *Continental Insurance,* 548 P.2d at 398, provides some guidance in determining when prejudice has been established. In *Continental,* the defendant insurance company was convicted of contempt for failure to comply with a discovery order, and was given a $10,000 fine. On appeal, the court held that Continental should not have been given a fine greater than $100, if there was no showing that the rights of the opposing party were prejudiced by failure to comply with the court's order. *Id.* at 408.

Under *Continental,* a mere violation of a court order or injunction is insufficient to prove prejudice to the rights or remedies of a party. However, damage to the rights or remedies of a party need not be measured solely in financial terms. In *Siggelkow v. State,* 731 P.2d 57, 62 (Alaska 1987), the supreme court held that an ex-husband's violation of a court order prohibiting him from contacting his ex-wife, prejudiced her right to be left alone and therefore was punishable by a term of imprisonment.

 In *Betzner v. State,* 768 P.2d 1150 (Alaska App.1989), this court found that the state's rights were prejudiced when a witness refused to testify. In *Betzner,* the magistrate who sentenced the defendant specifically found that the state was prejudiced by the refusal of a significant witness to testify. *Id.* at 1156. On appeal, this court held that the state was prejudiced in its right to present a significant witness even though the state ultimately secured a conviction. *Id.* at 1156. Therefore, under

the case law construing AS 09.50.020, it is clear that some tangible right of a party must be prejudiced in order to subject a defendant to the higher penalty of imprisonment and a $300 fine.

■ Viewing the evidence in the light most favorable to the state, it seems clear that reasonable jurors could find that O'Brannon's actions violated a remedy of the state. The state obtained a court order which enjoined O'Brannon from soliciting or accepting any advance payments or deposits in connection with a publication and from participating in any sort of business which involved the solicitation or acceptance of advanced payments or deposits for any publication. The court also had ordered O'Brannon to provide the Division with documentation detailing the customers to whom she had made restitution for failing to publish past directories and the amounts to which she paid each consumer. The court also ordered O'Brannon to file yearly reports, at the end of each calendar year, on her employment and business relationships and activities. It is uncontested that this was a lawful court order. The Division had a substantial interest in protecting the public from O'Brannon's business activities. There is no question that O'Brannon's actions as charged went to the heart of the state's remedy; she engaged in the prohibited business activities and failed to provide the required reports. We conclude that there was sufficient evidence to support the verdict.[2]

■ O'Brannon next argues that the trial court erred in failing to grant a continuance so that her trial attorney could represent her at sentencing. O'Brannon also contends that the trial court erred in not granting her a continuance so that she could present additional information at sentencing. The record shows that the jury returned its verdicts on April 25, 1988. The court scheduled sentencing to occur on June 29, 1988. On May 31, 1988, O'Brannon's trial attorney moved to continue the sentencing until sometime after September 8, 1988, because the attorney was going to be on leave from June 1, 1988, until September 8, 1988. The state opposed the continuance because of the length of time requested. The state expressed concern that O'Brannon had previously violated conditions of bail. On the day before the sentencing hearing was scheduled, O'Brannon moved for a continuance to allow a psychiatrist who was evaluating her to complete his report. The trial court denied this motion. However, for reasons which do not appear in the record, the sentencing hearing was postponed to July 14, 1988. At the sentencing hearing, defense counsel did not make any representation that she was unprepared, and submitted a psychiatric report at sentencing. We conclude that the trial court did not abuse its discretion in refusing to grant the continuances which O'Brannon requested. Although we would normally expect the trial court to go out of its way to make sure that O'Brannon could be represented at sentencing by the attorney who had represented her at trial, the continuance which O'Brannon requested was so lengthy that the trial court did not abuse its discretion in denying the continuance. The record does not establish that O'Brannon's counsel had an inadequate opportunity to prepare for sentencing or was in fact inadequately prepared. Under these circumstances, we find no error.

O'Brannon next argues that her sentence is excessive. Judge Rowland sentenced O'Brannon to a composite sentence of 375 days to serve with an additional 1,125 days suspended. Judge Rowland ordered O'Brannon to serve five years of probation upon her release from confinement. In sentencing O'Brannon, Judge Rowland found that O'Brannon had consistently and persistently demonstrated a disrespect for

---

2. Our disposition of this issue makes it unnecessary for us to decide whether the state must prove, as an element of the offense, that a right or remedy of a party to an action or proceeding was defeated or prejudiced by the contempt or whether this was a matter for the court to find at sentencing. The jury was instructed that it had to find that a right or remedy of a party to an action or proceeding was defeated or prejudiced by the contempt in order to find O'Brannon guilty. Given this finding, it seems clear that O'Brannon violated the state's injunctive remedy, and that the sentencing court so found.

court orders. He concluded that it was necessary for him to sentence O'Brannon to consecutive sentences. The court pointed out that the total amount of money collected by O'Brannon was "pretty significant."

O'Brannon contends that Judge Rowland's findings were insufficient to support a sentence in excess of the six-month maximum sentence for O'Brannon's most serious offense. O'Brannon points out that, in *Mutschler v. State*, 560 P.2d 377, 280 (Alaska 1977), the Alaska Supreme Court held that in order to impose an unsuspended sentence of imprisonment that exceeded the maximum sentence for the most serious offense, the sentencing court should expressly find that imposition of the full term of imprisonment was necessary to protect the public. In the instant case, the prosecutor informed Judge Rowland of this standard during the sentencing arguments in this case. We believe that Judge Rowland's statement that it was necessary to impose consecutive sentences can only reasonably be interpreted, in context, as applying the *Mutschler* standard. *See Neal v. State*, 628 P.2d 19, 21 (Alaska 1981) (the lack of an express finding of necessity to impose a consecutive sentence to protect the public may be inferred from the record).

The record also demonstrates that O'Brannon had twice been found in civil contempt of court. It appears from the record that O'Brannon collected a substantial amount of money without providing any services. The evidence produced at trial showed that O'Brannon collected $35,000 during the period covered by the contempt charges. The record demonstrates that O'Brannon flagrantly and continuously violated court orders. Under these circumstances, we conclude that the sentence was not clearly mistaken.

The conviction is AFFIRMED.

MANNHEIMER, J., not participating.